# United States Court of Appeals
## For the First Circuit

No. 10-1648

JUANITA SÁNCHEZ, on behalf of minor child D.R.-S.;
7,124 ADDITIONAL PLAINTIFFS FOUND IN ATTACHMENT A,

Plaintiffs, Appellants,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

Carter Glasgow Phillips, with whom John Arthur Eaves, Jr., and
Gabriel I. Peñagarícano-Soler were on brief, for appellants.
Eric W. Bloom and Winston & Strawn LLP on brief for
Municipality of Vieques, amicus curiae.
Adam Bain, Senior Trial Counsel, Torts Branch, Environmental
Torts, with whom Tony West, Assistant Attorney General, Civil
Division, J. Patrick Gylnn, Director, Torts Branch, Environmental
Torts, David S. Fishback, Assistant Director, Torts Branch,
Environmental Torts, Jane Mahoney, Senior Trial Counsel, Torts
Branch, Environmental Torts, Rosa E. Rodríguez-Vélez, United States
Attorney, and Nelson Jose Pérez-Sosa, Assistant United States
Attorney, were on brief, for appellee.

February 14, 2012

**LYNCH**, <u>Chief Judge</u>.  Juanita Sánchez and 7,124 additional named plaintiffs appeal from a Rule 12(b)(1) dismissal of their claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680.  Sánchez and her co-plaintiffs assert they have suffered tort injuries because of the United States Navy's alleged negligence in emitting certain pollutants during military exercises (which ended in 2003) at the Atlantic Fleet Weapons Training Facility (AFWTF) on Vieques Island, Puerto Rico.  The United States responds that the limited Congressional abrogation of sovereign immunity in the FTCA does not extend to these claims under the discretionary function exception to the FTCA, controlling Supreme Court precedent, and our own controlling precedent in <u>Abreu</u> v. <u>United States</u>, 468 F.3d 20 (1st Cir. 2006).  Because Congress did not intend to allow suits by private parties for damages under these circumstances, it has also determined that the federal courts lack jurisdiction over these claims.  The Municipality of Vieques has participated as an amicus curiae in support of the plaintiffs' claims.

Residents of Vieques brought a similar FTCA suit in <u>Abreu</u> for damages against the United States alleging that noise and air pollution from the Navy's exercises on Vieques caused them tort injuries.  <u>Abreu</u>, 468 F.3d at 23-24.  This court affirmed a Rule 12(b)(1) dismissal of the suit for lack of jurisdiction, <u>id.</u> at 23, holding that a damages action under the FTCA was not available

against the Navy based on an alleged violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq. Abreu, 468 F.3d at 29-32. To impose liability under the FTCA because of a federal employee's alleged failure to comply with a mandatory directive is not permissible, we held, if the imposition of liability "would undermine the purposes of the regulatory statute creating the mandatory directive." Id. at 30. Given that Congress expressly precluded compensatory damages for RCRA violations and the plaintiffs' suit would effectively enable them to get damages under the RCRA "under the guise of a FTCA claim," we held that to allow the plaintiffs' suit would undermine clear congressional intent. Id. at 32.

This case also raises the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), which precludes FTCA actions against government conduct which is both within the discretion of the relevant government party and susceptible to policy-related judgments. Abreu, 468 F.3d at 26-28. Abreu raised doubts that FTCA suits may be brought against government parties regulated by a federal statutory scheme, as opposed to government parties that exercise regulatory authority pursuant to such a statutory scheme, but did not resolve the question.[1] Id. at 27-28.

---

[1] It was unnecessary to address the discretionary function exception in that case for other reasons. Abreu v. United States, 468 F.3d 20, 28 (1st Cir. 2006). Given that Congress made clear its intent to prohibit compensatory damages against the United States for RCRA violations, it was irrelevant whether the Navy had

-4-

The plaintiffs in this suit argue that neither Abreu nor the discretionary function exception to the waiver of sovereign immunity precludes their FTCA claim here. They have four theories, some of which require dismissal under Abreu and some under the discretionary function bar on jurisdiction. They assert that the Navy is susceptible to suit and acted beyond its discretion because it allegedly (1) violated mandatory directives concerning water pollution issued pursuant to the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1389; (2) violated a pair of permits, which are not part of the record, that purportedly forbid firing depleted uranium bullets on Vieques; (3) violated unidentified internal regulations, policies, directives, and orders; and (4) failed to comply with a purported duty to warn the plaintiffs about pollution.

The district court rejected these arguments as well as several others not raised on appeal. Sanchez v. United States, 707 F. Supp. 2d 216 (D.P.R. 2010). We affirm the dismissal with prejudice for lack of jurisdiction.

I.

This court's decisions in Abreu and Romero-Barcelo v. Brown, 643 F.2d 835 (1st Cir. 1981), rev'd sub nom. Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982), describe in detail the history of the Navy's activities on Vieques. See Abreu, 468 F.3d at 23-24; Romero-Barcelo, 643 F.2d at 838-40. In brief, the Navy used 22,000

discretion to violate the RCRA directives. Id. at 29-31.

-5-

of the island's 33,000 acres as a training ground and live ordnance range at various points between 1941 and 2003. It established an ammunition facility on the western end of the island and used the eastern half of the island as a training range, which included a "live impact area" and an adjacent "maneuver area." Training exercises incorporated live munitions to simulate combat conditions, including artillery, mortar, small arms fire, naval surface fire, and aircraft strikes. The Navy also operated an open burning/open detonation facility on the island, where it incinerated and detonated unused ordnance. In May 2000, the Navy discontinued all live fire training exercises; all military exercises in Vieques were terminated as of April 30, 2003.

The 7,125 named plaintiffs filed this suit in September 2007, four years after the cessation of military operations on Vieques.[2] They allege that the Navy's operations on Vieques produced hazardous and toxic waste and that the Navy acted negligently in storing and disposing of this waste. In their complaint, the plaintiffs asserted eight state-law causes of action against the United States[3] under the FTCA, said to be: negligence,

_____

[2] The plaintiffs filed their original complaint in the U.S. District Court for the District of Columbia. In March 2009, the case was transferred for lack of venue to the District of Puerto Rico.

[3] In their first amended complaint, the plaintiffs listed various federal agencies and officials as defendants, but they have voluntarily dismissed all claims against parties other than the United States.

wrongful death, survival, negligent infliction of emotional distress, trespass, nuisance, civil taking, and fear and fright. The plaintiffs rely on a variety of ecological studies they assert demonstrate both heightened levels of certain heavy metals and other contaminants on Vieques and a link between these levels and higher rates of adverse health outcomes like infant mortality, cancer, hypertension, cirrhosis of the liver, and diabetes.

In their complaint, the plaintiffs also asserted that the Navy actions allegedly giving rise to their state-law claims for alleged injury[4] violated requirements outlined in various federal statutes, regulations, and policies, and thus were not within the Navy's discretion. Only three of these purported requirements are relevant on appeal: (1) a permit issued under the CWA concerning water-based pollutants, (2) a pair of permits not in evidence concerning the discharge of depleted uranium bullets, and (3) unnamed internal regulations, policies, directives, and orders. The complaint also included the assertion, reasserted on appeal,

---

[4] The complaint also invoked purported requirements under the Federal Facilities Compliance Act, 42 U.S.C. § 6961; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.; 32 C.F.R. § 700.832; 10 U.S.C. § 2705; and a provision of the Navy Environmental and Natural Resources Program Manual, OPNAVINST 5090.1B CH-2 § 20-5.1. The district court held that none of these provisions rendered the alleged conduct non-discretionary, and this holding has not been appealed.

that the Navy negligently failed to warn the plaintiffs about the pollution.

As to the first theory and the permit under the CWA, the Environmental Protection Agency (EPA) issued National Pollutant Discharge Elimination System (NPDES) Permit No. PRG990001 to the Navy's AFWTF in 1984.  The Navy had been ordered to apply for the permit by a federal district court.  See Weinberger, 456 U.S. at 315.  In Romero-Barcelo, the federal courts found that "the discharge of ordnance had not polluted the waters" of Vieques, see Weinberger, 456 U.S. at 315, and what the Navy had failed to do was to apply for an NPDES permit.  Indeed, the Supreme Court reversed this court and held that the issuance of an injunction against the Navy was not required.  Id. at 311-19.  The Navy did apply for a permit in 1979, and it contested Puerto Rico's contention that it was not complying with CWA water quality standards.  Id. at 315 n.9.

The NPDES permit, incorporating certain requirements set by the Environmental Quality Board of Puerto Rico, regulated the Navy's discharge of ordnance within a specified geographic area of ocean around Vieques.  In relevant part, the permit required that the Navy maintain water concentrations of certain compounds below the higher of (1) specific numerical requirements and (2) natural background concentration levels.  The permit stated that "at no

-8-

time shall the maximum values contained in the effluent exceed the water quality standards after mixing with the receiving water."

The plaintiffs allege that the Navy violated the terms of this permit more than a decade ago. They rely in large part on an attachment to an August 27, 1999, letter from William L. Muszynski, Deputy Regional Administrator for EPA-Region II, to Frank Rush, Assistant Secretary of Defense. The attachment states that between 1994 and April 1999, based on the Navy's Discharge Monitoring Reports (DMRs), EPA had "documented 102 exceedances of the water quality-based permit limits" under the NPDES. It also stated that "[t]he potential for a greater number of actual violations exists than is evidenced in the DMRs" given the structure of reporting requirements. The plaintiffs have also identified a September 15, 1999, letter from the EPA notifying the Navy that the AFWTF had failed to comply with the NPDES and that therefore it had violated the CWA. An attachment to the September 1999 letter listed violations determined from the Navy's DMRs and from an EPA site inspection.

As to the second theory and the alleged permits concerning depleted uranium, the plaintiffs rely on an April 1, 1999, letter to the Navy from the Nuclear Regulatory Commission and an accompanying report. The letter describes a particular event on February 19, 1999, in which two aircraft fired at least 263 depleted uranium 25 mm rounds on Vieques. It states, "The firing

of [depleted uranium] ammunition on Navy or Marine Corps firing ranges is a violation of the Navy's Master Material License No. 45-23645-01NA, and specifically, the Naval Radioactive Material Permit No. 13-00164-L1NP pertaining to depleted uranium." The letter did not, however, include the text of these permits, nor have the plaintiffs otherwise done so. The report accompanying the letter explained only that this type of ammunition is to be used strictly during combat, and that the pilots of the two aircraft did not follow required Navy procedures that they check a manual that classifies types of ammunition.

According to the report, "[v]isual searches and radiological surveys indicated that only a limited area of the North Convoy site was actually affected." The report stated that fifty-seven of the rounds had been recovered, "most of them completely intact," and that "[o]nly a few holes exhibited residual contamination after the [depleted uranium] penetrator was removed." It also stated that contaminated soil had been collected and packaged for disposal.

The plaintiffs allege that as of 2001 only 116 of the 263 rounds had been found and removed. They also cite an issue of the Vieques Issue Brief, a non-profit publication published by the Fellowship of Reconciliation, which refers to an unnamed study "conducted in the impact area" that found "significantly higher than background radiation levels about a mile from where the

[depleted uranium] was reportedly fired." The plaintiffs allege that this suggests depleted uranium has been used "on several other occasions on Vieques."

As to the third theory and the unnamed internal regulations, policies, directives, and orders, little further explanation is needed. The plaintiffs do not make any specific claims as to the content of these purported internal requirements. They argue only that the AFWTF range manual requires documentation of both compliance with and violations of the range's environmental procedures, and assert that this is evidence of the existence of mandatory internal requirements. The range manual contains general rules concerning permissible conduct on the island, and includes prohibitions on both intentionally discharging live ordnance into the water and discarding refuse or bilge from naval vessels. The plaintiffs argue, vaguely, that discovery of the internal reporting concerning these requirements would demonstrate violations of mandatory environmental policies.

As to the fourth theory, the plaintiffs argue that the Navy undertook a duty to warn residents of Vieques about heightened concentrations of heavy metals on the island when it allegedly allowed fishermen and cattle herders into contaminated areas. The plaintiffs argue that the Navy's failure to comply with this alleged duty was not susceptible to policy-related judgments and thus is a basis for FTCA liability. In support of this theory, the

plaintiffs rely on (1) a provision in an AFWTF range manual stating that a training range would be closed on Tuesdays and Fridays from 7 A.M. to 9 A.M. "to permit local fishermen to retrieve fishing traps from adjacent waters," and (2) an academic article that asserts, without citation, that "the US Navy allowed local farmers to graze cows in the eastern part of Vieques including at the AFWTF," A. Massol-Deyá, et al., Trace Elements Analysis in Forage Samples from a US Navy Bombing Range (Vieques, Puerto Rico), 2 Int'l J. Envtl. Res. & Pub. Health 263, 264 (2005). The plaintiffs assert that the Navy's alleged failure to issue a warning caused them to ingest contaminated food and travel in contaminated areas.

The district court rejected the arguments the plaintiffs present on appeal. It held that the plaintiffs (1) cannot rely on the Navy's NPDES permit under the reasoning of Abreu because Congress clearly intended to preclude compensatory damages under the CWA, Sanchez, 707 F. Supp. 2d at 232-33; (2) failed to specify how the alleged directives concerning depleted uranium bullets were mandatory, id. at 223; (3) failed to adequately plead their assertions concerning the unnamed internal requirements under Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), Sanchez, 707 F. Supp. 2d at 233; and (4) failed to show that the Navy's purported failure to warn was not discretionary and not susceptible to policy-related judgments and therefore was excluded from FTCA liability, id. at 230.

-12-

II.

The district court's ultimate rulings were ones of law, which we review de novo. Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 496 (1st Cir. 2011).

On this Rule 12(b)(1) motion, we must "credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010). To the extent that the plaintiffs challenge the district court's discovery rulings, which they raise obliquely in reference to their argument concerning the firing of depleted uranium bullets, we review a denial of discovery for abuse of discretion. Braga v. Hodgson, 605 F.3d 58, 59 (1st Cir. 2010).

The FTCA's waiver of sovereign immunity from suit is a "limited waiver." Molzof v. United States, 502 U.S. 301, 305 (1992); Abreu, 468 F.3d at 23. One exception to that waiver of immunity bars lawsuits "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If this discretionary function exception applies, the FTCA's jurisdictional grant under 28 U.S.C. § 1346(b) does not, such that "the [government] is completely immune from suit, and the claim must be dismissed for lack of subject matter jurisdiction." Abreu, 468 F.3d at 25 (alteration in original) (quoting Santoni v.

-13-

<u>Potter</u>, 369 F.3d 594, 602 (1st Cir. 2004)) (internal quotation marks omitted).

Under <u>United States</u> v. <u>Gaubert</u>, 499 U.S. 315 (1991), the discretionary function exception applies if the conduct underlying an FTCA claim both (1) "involves an element of judgment or choice," <u>Limone</u> v. <u>United States</u>, 579 F.3d 79, 101 (1st Cir. 2009) (quoting <u>Berkovitz</u> v. <u>United States</u>, 486 U.S. 531, 536 (1988)) (internal quotation marks omitted), and (2) "was susceptible to policy-related analysis," <u>id.</u> Conduct does not involve an element of judgment or choice if a "'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" <u>Gaubert</u>, 499 U.S. at 322 (quoting <u>Berkovitz</u>, 486 U.S. at 536). Conduct is susceptible to policy analysis if "some plausible policy justification could have undergirded the challenged conduct;" it is not relevant whether the conduct was "the end product of a policy-driven analysis." <u>Shansky</u> v. <u>United States</u>, 164 F.3d 688, 692 (1st Cir. 1999). This discretionary function bar to suit applies to activities by both civilian and military agencies covered by the FTCA.

As the Supreme Court has held, the discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by

-14-

private individuals." United States v. S.A. Empresa de Viacao Aerea Dio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984) (quoted in Abreu, 468 F.3d at 25). Through this exception to the FTCA's waiver of immunity, Congress sought to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 814 (quoted in Abreu, 468 F.3d at 25). Accordingly, a complaint cannot survive a motion to dismiss unless it alleges facts "which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Gaubert, 499 U.S. at 324-25.

The Supreme Court has held that the discretionary function exception does not bar suit when an employee violates a mandatory regulation. See id. at 324. The Court has applied this rule in private party suits against defendant federal regulators, but not in suits against defendant federal regulated parties, Abreu, 468 F.3d at 27, and it has not made a distinction based on whether the regulated party is civilian or military. The Navy here fits into the defendant federal regulated party category. The Navy does not purport to exercise discretion under the regulatory regimes plaintiffs invoke in this litigation; rather, its discretion "comes from an entirely different source, namely, its authority to conduct military operations." Id. In light of this,

-15-

in _Abreu_ we concluded that "the rule in _Gaubert_ may well be inapplicable to mandatory directives aimed at a regulated party, where the regulated party is not exercising discretion under the mandatory statute or regulation." _Id._ We also concluded there is a "particularly strong argument for limiting the rule of _Gaubert_ where the exercise of military authority is involved, in view of the numerous cases cautioning the courts to avoid interfering with the exercise of discretionary military authority." _Id._ at 27-28 (citing _United States_ v. _Shearer_, 473 U.S. 52, 57 (1985)).

Our decision in _Abreu_ did not reach the question of whether the _Gaubert_ rule applies to regulated entities generally, as we found that the rule was inapplicable to the claims at issue in that suit for other reasons. 468 F.3d at 28. We need not address this more sweeping question here either, as it is clear that each of the plaintiffs' four arguments fail for other reasons.

A.        The Claim Based on the CWA and the NPDES Permit

When evaluating "contentions that the violation of mandatory requirements implies a waiver of sovereign immunity under the FTCA, we must refrain from imposing liability on the government when doing so would subvert a congressional decision to preclude regulated entity liability in the statute creating the mandatory directive." _Id._ at 30. The Supreme Court in _Dolan_ v. _United States Postal Service_, 546 U.S. 481 (2006), stated that "the general rule that 'a waiver of the Government's sovereign immunity

-16-

will be strictly construed, in terms of its scope, in favor of the sovereign,'" did not apply in a case interpreting an exception to the FTCA.  Id. at 491 (quoting Lane v. Peña, 518 U.S. 187, 192 (1996)).  "[T]he proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify those circumstances which are within the words and reason of the exception -- no less and no more."  Id. at 492 (quoting Kosak v. United States, 465 U.S. 848, 853 n.9 (1984)) (internal quotation marks omitted).  In Abreu, we held that the unavailability of damages under the RCRA demonstrated that "allowing recovery of compensatory damages under the FTCA for RCRA violations would adversely affect the RCRA statutory scheme."[5]  468 F.3d at 31.

The RCRA, we held, did not present "a situation in which Congress simply left unaddressed the question of damages liability under the mandatory statute."  Id.  The statute's citizen-suit provision confers jurisdiction on district courts to "restrain" violations and order persons in violation of permits, standards, regulations, conditions, requirements, prohibitions, or orders effective under the statute to "take such other action as may be necessary."  42 U.S.C. § 6972(a); see also Abreu, 468 F.3d at 31.

---

[5]  Abreu also involved a claim that the Navy was subject to an FTCA suit because it had violated the CWA by not having a valid NPDES permit.  468 F.3d at 28-29.  Citing United States v. Zenón-Encarnación, 387 F.3d 60, 63-64 (1st Cir. 2004), Abreu rejected further consideration of the theory because it was clear the Navy did have a valid permit.  468 F.3d at 28-29.

-17-

We stated that although this provision "confers jurisdiction over suits for injunctive relief," Abreu, 468 F.3d at 31, the Supreme Court had recognized limits on this grant of jurisdiction to compensatory damages, id. (citing Meghrig v. KFC W., Inc., 516 U.S. 479, 484-85 (1996)), and it was clear that Congress did not intend that the RCRA "authorize civil tort actions against the federal government for damages," id. at 32 (quoting H. Rep. No. 102-111, at 15 (1991), as reprinted in 1992 U.S.C.C.A.N. 1301) (internal quotation mark omitted).

It is clear that Congress did not intend that the CWA authorize civil tort actions against the federal government for damages. The plaintiffs' theory that they may sue under the FTCA for alleged CWA violations is expressly barred by the intent of Congress. In Meghrig, the Supreme Court relied on its decision in Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1 (1981), for the proposition that when "Congress has provided 'elaborate enforcement provisions' for remedying the violation of a federal statute . . . 'it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under' the statute." Meghrig, 516 U.S. at 487-88 (quoting Sea Clammers, 453 U.S. at 14). The decision in Sea Clammers addressed, inter alia, the availability of compensatory damages under 33 U.S.C. § 1365(a), the citizen-suit provision in the CWA. 453 U.S. at 14. That provision states that

the district courts have jurisdiction "to enforce . . . an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty" and apply "civil penalties" allowed in a separate provision. 33 U.S.C. § 1365(a).

In Sea Clammers, the Supreme Court held that both the structure and legislative history of the CWA dictate that "Congress intended that private remedies in addition to those expressly provided [in the CWA] should not be implied." 453 U.S. at 18. It reasoned that "[w]here, as here, Congress has made clear that implied private actions are not contemplated, the courts are not authorized to ignore this legislative judgment." Id. The Court emphasized that the Senate Report for the Act "placed particular emphasis on the limited nature of the citizen suits being authorized." Id. at 18 n.27 (citing S. Rep. No. 92-414, at 81 (1971)). It also emphasized that "the citizen-suit provision of the [CWA] was expressly modeled on the parallel provision of the Clean Air Act," and that the "legislative history of the latter Act contains explicit indications that private enforcement suits were intended to be limited to the injunctive relief expressly provided for." Id.

Sea Clammers does not only demand the conclusion that Congress intended to foreclose the availability of compensatory damages under the CWA. The decision also supports the conclusion, required by Abreu, that this clear congressional intent is relevant

-19-

in determining the availability of an action for damages under the FTCA. See Abreu, 468 F.3d at 30. In Sea Clammers, the Court held that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under [42 U.S.C.] § 1983." Sea Clammers, 453 U.S. at 20. "It is hard to believe," the Court stated, "that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies," including the citizen-suit provision in the CWA, 33 U.S.C. § 1365(a), and a parallel provision in the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1415(g). Sea Clammers, 453 U.S. at 20.

As in Abreu, "allowing the recovery of damages in a FTCA suit, based on the violation of a mandatory permitting requirement" under a federal statute that precludes compensatory damages "would undermine the intent of Congress." Abreu, 468 F.3d at 32. For the reasons already articulated in Abreu, moreover, "the waiver of sovereign immunity reflected in various statutes must be interpreted in light of significant policies reflected in other related federal statutes." Id. at 30. Sea Clammers makes clear that the decision not to permit damages under the CWA is a significant policy of that statute, and a policy significant enough to demand the conclusion that Congress intended the CWA to

-20-

foreclose the availability of damages available before the statute was enacted.[6]  Sea Clammers, 453 U.S. at 20-21.

The plaintiffs seek to evade this conclusion by arguing that our Abreu decision was inconsistent with previously decided Supreme Court precedent and with decisions of other courts.  That is not so.  With respect to the Supreme Court precedent, they argue that Abreu is inconsistent with Gaubert, as well as general statements by the Supreme Court that the FTCA's exceptions should not be construed in an "unduly generous" fashion, see Kosak, 465 U.S. at 853 n.9; see also Block v. Neal, 460 U.S. 289, 298 (1983). With respect to the decisions from beyond this circuit, the plaintiffs invoke a pair of district court decisions that postdate Abreu.  See In re Katrina Canal Breaches Consol. Litig., 647 F. Supp. 2d 644 (E.D. La. 2009); Adams v. United States, No. 03-0049, 2006 WL 3314571 (D. Idaho Nov. 14, 2006).  They argue that these decisions demand that we confine Abreu to its facts and allow their present FTCA claim to proceed.  We disagree.

A panel of this court is ordinarily "constrained by prior panel decisions directly (or even closely) on point."  United States v. Guzmán, 419 F.3d 27, 31 (1st Cir. 2005).  A panel is not so bound when a prior panel decision has been undermined by (1)

---

[6] Whether or not a presidential exception can be made to compliance with the CWA does not undermine either the congressional determination that damages are unavailable under the CWA or that suit may not be maintained under the FTCA absent compliance with the conditions specified in that Act.

controlling authority that postdates the decision, like a Supreme Court opinion, en banc decision of the circuit, or statutory overruling, or (2) non-controlling authority that postdates the decision that may offer "a compelling reason for believing that the former panel, in light of new developments, would change its collective mind."  Id.  The second exception, we have stated, "fairly may be described as hen's-teeth rare."  Id.

The plaintiffs have hardly advanced an argument under the second of these exceptions, and they have advanced no argument under the first.  The Supreme Court decisions do not postdate Abreu.  Indeed, the Abreu panel carefully considered how the Supreme Court's decision in Gaubert informed its analysis and how other Supreme Court precedent informed the breadth of exceptions to FTCA liability.  The two district court opinions from beyond this circuit do not suffice to meet the exacting standard of the second exception.[7]

B.        The Claim Concerning Depleted Uranium Bullets

A court inquiring into whether an FTCA claim falls within the discretionary function exception must first "identify the

---

[7]  The plaintiffs could have filed timely claims under the CWA for alleged violations of that Act.  They could not have recovered damages, a limitation this suit attempts to bypass.  This suit also attempts to bypass the administrative procedures under the Act and the creation of an administrative record.  There were other mechanisms available to secure compliance with the CWA.  We reject as untrue and unwarranted hyperbole the argument of amicus that dismissal of this case "condones" any violations by the Navy.

conduct that allegedly caused the harm." Muniz-Rivera v. United States, 326 F.3d 8, 15 (1st Cir. 2003); see also Irving v. United States, 162 F.3d 154, 162 (1st Cir. 1998) (en banc). This inquiry is a factual one. When facts relevant to a jurisdictional question are dispositive of both that jurisdictional question and portions of the merits, a Rule 12(b)(1) motion should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Torres-Negrón v. J & N Records, LLC, 504 F.3d 151, 163 (2007) (quoting Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1558 (9th Cir. 1987)) (internal quotation marks omitted).

The parties largely agree on the facts concerning the firing of 263 uranium bullets described in the Navy's April 1999 letter to the Nuclear Regulatory Commission and its accompanying report. They diverge, however, on whether additional incidents involving the firing of uranium bullets occurred on Vieques, and on whether the firing of uranium bullets caused the injuries alleged by the plaintiffs. The plaintiffs argue that their allegations are sufficient to raise disputed material facts. To do so, they must "identify specific facts derived from pleadings, depositions, answers to interrogatories, admissions and affidavits." Magee v. United States, 121 F.3d 1, 2 (1st Cir. 1997). As we have held, "[i]t is a long standing principle of this Circuit that bald assertions and unsupportable conclusions are not enough to create

-23-

a genuine issue of material fact." Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R., 394 F.3d 40, 44 (1st Cir. 2005).

The plaintiffs fall short of this standard for several reasons. They rely on one unnamed study for the proposition that depleted uranium bullets caused their injuries. In the portion of their complaint alleging the harm, they made no reference to uranium or radioactive materials. Instead, they referred to concentrations of certain heavy metals. The complaint did reference uranium in a brief description of the unexploded ordnance on the island and in a brief account of the alleged incident involving the 263 rounds, but these references have not been supported. These allegations are also not on par with the plaintiffs' other allegations concerning the breadth of the Navy's discretion. The complaint only cursorily mentioned the incident involving depleted uranium bullets as evidence of a larger pattern of pollution; it focused on allegations of causation concerning pollutants that the plaintiffs do not address on appeal.

Even if the plaintiffs had raised a material fact that the Navy's firing of depleted uranium bullets caused the injuries they allege (as they have not), they have failed to adequately allege that the challenged conduct was non-discretionary, assuming Gaubert would apply here. Under Gaubert, conduct does not involve an element of judgment or choice if a "federal statute, regulation,

or policy _specifically_ prescribes a course of action for an employee to follow." _Gaubert_, 499 U.S. at 322 (emphasis added) (quoting _Berkovitz_, 486 U.S. at 536) (internal quotation marks omitted). Without this specificity requirement, we have held, "the discretionary function exception would be a dead letter." _Shansky_, 164 F.3d at 691.

This court has repeatedly rejected arguments that conduct was non-discretionary under _Gaubert_ when FTCA plaintiffs have identified only vague, permissive, or unidentified requirements for government conduct. _See, e.g., Muniz-Rivera_, 326 F.3d at 16; _Shansky_, 164 F.3d at 691-92; _Irving_, 162 F.3d at 163-66. It is not sufficient for a plaintiff to identify a statute, regulation, or policy that contains mandatory directives; directives must be "directly applicable" to the challenged conduct. _Muniz-Rivera_, 326 F.3d at 16; _see also Irving_, 162 F.3d at 163 (holding that because regulations did not mandate "a particular _modus operandi_" for government employees or "otherwise materially restrict [their] flexibility," they did not render the government's conduct non-discretionary). Nor may a plaintiff rely on an "unsubstantiated recollection of an unidentified policy statement;" "testimony that purports to describe written policies and regulations is no substitute for the original text." _Shansky_, 164 F.3d at 692.

The plaintiffs here contend that they have identified policies that specifically eliminate the Navy's discretion with

-25-

respect to the firing of depleted uranium bullets.  They have not, however, introduced the language of these permits or situated them within a broader regulatory scheme.  The Navy letter and accompanying report plaintiffs rely on is surely more than an "unsubstantiated recollection of an unidentified policy statement," see id., but the content of these purported requirements remains unclear.  The letter only states that there has been a violation of the permit requirements; it does not identify the content of those requirements.  The only concrete requirements referenced in the report pertain to internal Navy procedure concerning ammunition classifications, which is not connected in any way to either of the permits.

As we held in Irving, moreover, the Gaubert analysis requires attention to how a particular agency announces policy. Irving, 162 F.3d at 165.  An agency may promulgate regulations on some topics but not others, it may rely on internal guidelines instead of published regulations, it may announce policy through rulemaking and adjudication, and so on.  See id.  These practices inform whether an agency statement constitutes a mandatory policy statement for purposes of the discretionary function exception; in Irving, for example, we could "well imagine that resort to informal indicia may be justified either when an agency's legislative rules define the conduct of some employees, but not others . . . or when legislative rules create ambiguity."  Id.  Here, the plaintiffs

have failed to show that the purported permits, even if they limit the firing of depleted uranium bullets, are mandatory in the relevant sense.

Our Abreu decision gives a further, related reason to reject the argument that this FTCA claim should go forward on the ground that the Navy's conduct was non-discretionary. In Abreu, we recognized that congressional intent may foreclose a claim for damages against the United States premised on violations of federal law. Abreu, 468 F.3d at 29-32. Because the plaintiffs have neither introduced the text of the permits upon which they rely nor identified the statutory context governing the alleged permits, they have not come close to establishing that Congress intended that damages be available or unavailable for violations of the two alleged permits. In light of the many cases cautioning against interference with discretionary military authority, moreover, this is a particularly significant omission. See id. at 28.

The plaintiffs contend that they cannot produce the text of the two permits because the district court erroneously denied their motion for jurisdictional discovery. Even were the claim not waived,[8] we would reject it. A district court has discretion to

_____

[8] The plaintiffs cite no case law in asserting this claim. They argue, in a single paragraph of their brief, that the district court put them in an "impossible position" by requiring that they show the two permits contained mandatory language and yet disallowing jurisdictional discovery. Claims presented in a perfunctory manner are deemed waived. Cortés-Rivera v. Dep't of Corr. & Rehab., 626 F.3d 21, 26 (1st Cir. 2010).

-27-

defer pre-trial discovery pending resolution of a jurisdictional question when "the record indicates that discovery is unnecessary (or, at least, is unlikely to be useful) in regard to establishing the essential jurisdictional facts." Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 38 (1st Cir. 2000). The plaintiffs' discovery request sought a broad range of documents, many of which had no apparent relationship to jurisdictional questions. The request did not mention the permits at issue, and only referenced depleted uranium in a pair of sweeping requests. The district court was well within its discretion in refusing to allow a "fishing expedition" by granting the plaintiffs' "inherently speculative" discovery request. Sanchez, 707 F. Supp. 2d at 231.

C.      The Claims Based on Unnamed Internal Requirements

The same basic reasoning applies to the plaintiffs' argument that unnamed internal requirements establish that the Navy's conduct was non-discretionary. The plaintiffs argue that while they have not identified any specific regulations, policies, directives, or orders, their allegations are sufficient to support "the reasonable inference" that such requirements exist for purposes of the pleading standard outlined in Iqbal, 129 S. Ct. 1937. But the plaintiffs' allegations say nothing of the specific content of the alleged internal directives, what these alleged directives require, or how the alleged requirements relate to the challenged conduct.

D.          <u>Claim of Alleged Failure to Warn</u>

As in <u>Abreu</u>, the plaintiffs here cannot contest that "the military activities carried out by the Navy on Vieques over the past several decades have involved discretionary decision-making of the most fundamental kind, requiring balancing competing concerns of secrecy and safety, national security and public health." <u>Abreu</u>, 468 F.3d at 26 (internal quotation marks omitted). The plaintiffs nonetheless allege that the Navy allowed them to enter, graze cattle, and fish in polluted areas of Vieques without providing further warning about pollution levels, and that this alleged decision was not susceptible to policy analysis. The plaintiffs' argument does not raise the question of whether the alleged emitting of pollution itself was susceptible to policy-related considerations, only whether there was a duty to warn that was not susceptible to policy-related judgments. The source of this alleged non-discretionary duty to warn suffers from vagueness and indeterminacy[9] and so, as explained earlier, fails to meet the

_____

[9] Before the district court, the plaintiffs made a related argument that 10 U.S.C. § 2705 imposes a duty on the Secretary of Defense to report certain environmental degradation to the EPA and authorities in Vieques. The plaintiffs do not rely on this provision on appeal and so have waived any argument.

By its clear terms, the statute also reinforces that the Secretary has discretion. It states that the Secretary "shall <u>take such actions as necessary</u>" as to disclosure. <u>Id.</u> § 2705(a) (emphasis added). Further, the Secretary establishes review committees only "[w]henever possible and <u>practical</u>." <u>Id.</u> § 2705(c) (emphasis added). The Secretary "<u>may</u>" seek technical assistance. <u>Id.</u> § 2705(e)(1) (emphasis added).

<u>Gaubert</u> requirements. In addition, the theory of liability has other flaws.

In two recent cases, this circuit rejected analogous arguments that safety concerns dictated a specific course of conduct that could not be subject to policy analysis. <u>Shansky</u>, 164 F.3d at 693 (rejecting the argument that "when safety becomes an issue, all else must yield"); <u>Irving</u>, 162 F.3d at 168 (holding that the purpose of OSHA is "to provide for a satisfactory standard of safety, not to guarantee absolute safety"); <u>see</u> <u>also</u> <u>Shuman</u> v. <u>United States</u>, 765 F.2d 283 (1st Cir. 1985) (Navy protected from liability under the discretionary function exception because whether, and at what time, the Navy should have undertaken duty to warn contractor's employees about hazards of working with asbestos was matter of discretion).

The plaintiffs do not address these cases and instead rely on out-of-circuit cases which neither bind us nor support their argument.[10] In particular, the plaintiffs rely on <u>Andrulonis</u> v. <u>United States</u>, 952 F.2d 652 (2d Cir. 1991), and <u>Whisnant</u> v. <u>United States</u>, 400 F.3d 1177 (9th Cir. 2005). In <u>Andrulonis</u>, a government researcher contracted rabies after his supervisor failed

_____

   [10] In addition to decisions from beyond this circuit, the plaintiffs invoke the Supreme Court's decision in <u>Indian Towing Co.</u> <u>v. United States</u>, 350 U.S. 61 (1955). That decision did not involve the discretionary function exception and instead concerned the meaning of "in the same manner and to the extent as a private individual under like circumstances," in 28 U.S.C. § 2674. <u>Indian Towing</u>, 350 U.S. at 64-65. We need not address it further here.

to warn him about dangerous conditions in the laboratory where he worked. 952 F.2d at 653. The Second Circuit held that no policy considerations could explain a failure to warn about such "obvious, easily-correctable dangers in experiments." Id. at 655. In Whisnant, the plaintiff alleged that he became ill because the government negligently failed to address "toxic mold" at a commissary on a Naval base. 400 F.3d at 1179-80. The Ninth Circuit agreed, holding that the mold presented an "obvious health hazard," id. at 1183, and that "a failure to adhere to accepted professional standards is not susceptible to a policy analysis," id. (quoting Bear Medicine v. United States ex rel. Sec'y of the Dep't of Interior, 241 F.3d 1208, 1217 (9th Cir. 2001)) (internal quotation mark omitted).

The present case does not present a situation akin to those in Andrulonis and Whisnant. Unlike the obvious, easily-correctable danger at issue in Andrulonis, the plaintiffs do not challenge an obvious health hazard or an easily-correctable danger from environmental effects.[11] Instead, the plaintiffs argue that

---

[11] We do not reach the question of whether the plaintiffs here alleged a causal connection between the claimed lack of notice of pollutants inherent in military exercises and their injuries.
Turning to the issue of failure to warn, in fact, it was well known the Navy was engaged in such military exercises. "[I]n 1977, the government of Puerto Rico initiated litigation which eventually resulted in a district court order requiring the Navy to comply with certain federal environmental statutes . . . ." Abreu, 468 F.3d at 23. The Navy obtained an interim permit for the AFWTF in 1980. Id. at 24. In 1983, the Navy and the government of Puerto Rico entered into a Memorandum of Understanding under which

the Navy assumed certain obligations concerning disclosure of pollution given that it detonated and fired live ammunition on Vieques during inherently polluting military exercises. Nor do the plaintiffs assert that the Navy's conduct violated a professional set of guidelines like the professional guidelines at issue in Whisnant. Their argument instead amounts to the assertion that the pollution at issue here was known to be significant during the operations, and that therefore questions related to disclosure could not be subject to policy considerations.

This argument ignores that the Navy, like other agencies, must weigh competing interests between "secrecy and safety, national security and public health." Abreu 468 F.3d at 26 (internal quotation mark omitted).

Both the D.C. and Ninth Circuits have recognized such competing considerations in similar situations concerning disclosures about pollutants by the United States military in cases holding that the discretionary function exception applies. See Loughlin v. United States, 393 F.3d 155 (D.C. Cir. 2004); In re Consol. U.S. Atmospheric Testing Litig., 820 F.2d 982 (9th Cir. 1987). In Loughlin, the D.C. Circuit rejected the argument that the government's decision to bury toxic World War I munitions under a Washington, D.C., neighborhood without public disclosure was not

---

the Navy made certain changes in the AFWTF. Id. The plaintiffs do not and cannot make the claim that the Navy never provided any notice of the environmental impact of its activities.

susceptible to policy considerations.  393 F.3d at 164-66.  In
Atmospheric Testing, the Ninth Circuit similarly rejected the
argument that the government's decision not to disclose radiation
hazards from a military testing program were not susceptible to
such considerations.  820 F.2d at 996-99.

Both courts, while noting the existence of safety risks,
held that the government's interests in security, secrecy, and
public order were also relevant in its decision whether to make
disclosures to the public.  Whether to warn the public about the
munitions, the D.C. Circuit held, "required balancing 'competing
concerns of secrecy and safety, national security and public
health.'"  Loughlin, 393 F.3d at 164 (quoting Loughlin v. United
States, 286 F. Supp. 2d 1, 23 (D.D.C. 2003)).  Similarly, whether
to warn the public about the radiation, the Ninth Circuit held,
"required balancing the magnitude of the risk from radiation
exposure" against "the potential consequences of creating public
anxiety and the health hazards inherent in the medical responses to
the warning."  Atmospheric Testing, 820 F.2d at 997.

The plaintiffs attempt to distinguish these two cases by
arguing that the Navy allegedly actively facilitated their exposure
to health hazards, whereas the government actors in Loughlin and
Atmospheric Testing did not.  The plaintiffs have made no specific
allegations that the government actively facilitated such exposure.
They rely only on a range manual stating that the Navy occasionally

-33-

allowed fishermen to retrieve traps from "adjacent waters" and a single journal article that states, without citation, that the Navy allowed farmers to graze cows in areas of the AFWTF.  At most, these allegations show that on limited occasions the Navy permitted access to lands and waters in what was a discretionary decision.  Plaintiffs do not claim that a statute or regulation mandated a duty to even do that, much less anything more than that.  Moreover, these allegedly facilitative actions are no different from the facts in Loughlin and Atmospheric Testing, where the government also allegedly allowed members of the public to be exposed to pollutants.

In their reply brief, the plaintiffs also advance a variety of more minute factual distinctions between this case and both Loughlin and Atmospheric Testing.  None of these distinctions are relevant here.  We do not rely on these two cases as binding authority.  Rather, we rely on them as illustrative of the proposition that disclosures about safety risks attendant to military operations may be subject to other policy considerations.  Here, the government had reason to be concerned with the national security implications of disclosing information about its operations on Vieques.

Numerous cases in the courts of appeals hold that the government's decision whether to warn about the presence of toxins, carcinogens, or poisons falls under the discretionary function

-34-

exception to the FTCA's waiver of sovereign immunity. See Ross v. United States, 129 F. App'x 449 (10th Cir. 2005) (discretionary function exception applied to Air Force's decision whether and how to warn neighbors of contamination of ground water by trichloroethylene buried by Air Force); Savary v. United States, No. CV-95-07752, 1999 WL 1178956 (9th Cir. Dec. 14, 1999) (per curiam) (table case) (Jet Propulsion Laboratory's failure to issue warnings to its employees regarding dangers of exposure to soil and groundwater contaminated by hazardous materials fell under the discretionary function exception because the decision to make such a warning required judgments balancing the magnitude of risk associated with contamination with the risks and burdens of a public warning program); Minns v. United States, 155 F.3d 445, 450 (4th Cir. 1998) (military's decision whether to warn veterans about dangers of inoculations or exposure to pesticides fell under discretionary function exception, and "questioning the military's decision" would create a "court-intrusion problem"); Maas v. United States, 94 F.3d 291, 297 (7th Cir. 1996) (Air Force's decision not to warn veterans of cancer dangers associated with cleaning up crash site of bomber carrying nuclear weapons fell under discretionary function exception: "[d]eciding whether health risks justify the cost of a notification program, and balancing the cost and the effectiveness of a type of warning, are discretionary decisions"); Angle v. United States, No. 95-1015, 1996 WL 343531,

at *3 (6th Cir. June 20, 1996) (per curiam) (table case) (Air Force's decision not to warn occupants of base housing of lead paint contamination fell under discretionary function exception: the Air Force "had to balance the potential effectiveness of a general warning against the possibility that such a warning might cause unfounded fears"); Daigle v. Shell Oil Co., 972 F.2d 1527 (10th Cir. 1992) (Army's failure to warn residents that cleanup of nearby toxic waste dump could cause exposure to waste fell under discretionary function exception because procedures implementing cleanup implicated policy considerations underlying CERCLA response actions). It is not just the military which has been shielded by the discretionary function exception from claims under the FTCA for alleged breach of a duty to warn; non-military government agencies have been so shielded as well. See Smith v. Johns-Manville Corp., 795 F.2d 301 (3d Cir. 1986) (General Service Administration's decision to sell surplus asbestos "as is" without warnings or warranties fell within the discretionary function exception); Begay v. United States, 768 F.2d 1059 (9th Cir. 1985) (decision of Public Health Service not to warn uranium miners of the dangers they were exposed to was clearly within the ambit of the discretionary function exception).

The law as announced by the Supreme Court requires dismissal of the claim. It is clear that the Navy engaged in both choice and judgment as to who had permission to be in AFWTF lands

-36-

and waters and what was said about that access.  See Gaubert, 499 U.S. at 325 (discretionary function exception reached decisions made by federal regulators in overseeing savings and loan association's operations); Boyle v. United Techs. Corp., 487 U.S. 500, 511 (1988) (selection of appropriate design for military equipment to be used by the Armed Forces is a discretionary function); Varig Airlines, 467 U.S. at 819-20 (discretionary function exception barred claims based on FAA's alleged negligence in implementing and applying a "spot-check" system of compliance review).  It is also clear that this exercise of discretion is susceptible to policy-related judgments.  The Navy's choices were not pursuant to meeting the regulatory requirements of another agency, but pursuant to its judgment as to how it conducted its military operations.  As the government's brief says, "With respect to any warning, the Navy would have had to balance its military and national security needs against any perceived benefits to public health and safety in light of the risks and burdens of a warning program and the great public anxiety warnings could create."

The Supreme Court has made clear that federal courts are constrained not to interfere with the exercise of such discretion by any agency, and that is particularly so in the running of military operations.  No concerns are raised as to civilian control of the military.  In a case reversing an injunction against the Navy for alleged NEPA violations, the Supreme Court noted, "'To be

-37-

prepared for war is one of the most effectual means of preserving peace.' . . . One of the most important ways the Navy prepares for war is through integrated training exercises at sea." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 370 (2008) (quoting 1 Messages and Papers of the Presidents 57 (J. Richardson comp. 1897) (statement of Pres. George Washington)). Courts "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Id. at 377 (quoting Goldman v. Weinberger, 475 U.S. 503, 507 (1986)) (internal quotation marks omitted). Plaintiffs do not even claim that these judgment calls violated mandatory federal law.

It is not the role of the courts to second-guess the Navy's conclusions after it weighed these competing considerations. See Gaubert, 499 U.S. at 323. As a result, the courts have been stripped of their jurisdiction over this claim and may not entertain this cause of action.

III.

For the reasons stated above, the dismissal of plaintiffs' complaint was required by law.

This opinion takes no position on whether the Navy's operations on Vieques have had adverse health effects on the island's residents. It holds only that the plaintiffs have not stated a valid claim for damages under the FTCA.

Nonetheless, while the majority's view is that the dismissal of the suit must be affirmed, and the dissent disagrees, the plaintiffs' pleadings, taken as true, raise serious health concerns. The government has acknowledged the existence of these concerns.[12] The majority and the dissent agree that these issues should be brought to the attention of Congress. The Clerk of Court is instructed to send a copy of this opinion to the leadership of both the House and Senate.

The judgment of the district court is <u>affirmed</u>. No costs are awarded.

**-- Dissenting Opinion Follows --**

---

[12] The brief of the United States has advised the court that the Agency for Toxic Substance Disease Registry (ATSDR) of the Centers for Disease Control and Prevention "is in the process of taking a 'fresh look' at potential environmental exposures to the population of Vieques as a result of the Navy's training activities." The reasons stated for the review were gaps in the data on which prior reports had relied, and that the prior reports did not adequately consider either vulnerable populations or the limitations and uncertainty of the findings.

**TORRUELLA, <u>Circuit Judge</u> (Dissenting).** The majority strikes a melancholic chord in its treatment and analysis of the Plaintiffs' allegations in this case. Sadly, this is the same chord that has reverberated throughout the long-standing continuum of disputes and grievances between the United States citizens residing in Puerto Rico's two off-shore municipalities of Culebra and Vieques, and the Government of the United States. It resonates even more tellingly in this appeal when considered in the light of the turbulent history of this relationship.

The first chapter of this sorry tale commenced in 1941, when the United States expropriated the overwhelming majority of the lands in Vieques and Culebra, thereafter declaring them to be military reservations. In the remaining areas there existed, and continue to exist to this day, full scale civilian communities with organized municipal governments that are fully integrated to the rest of the political system of the Commonwealth of Puerto Rico.[13] These communities were thereafter encapsulated within the surrounding federal lands.[14]

---

[13] The population of Culebra consists of about 1,000 permanent residents while that of Vieques is about 9,300 persons.

[14] <u>See</u> <u>Romero-Barceló</u> v. <u>Brown</u>, 478 F. Supp. 646, 659-60 (D.P.R. 1979) (as to Vieques, describing the Navy's property as "physically divided into two sections [that are] bisected by the civilian area of [the island]"). In the case of Culebra, by presidential proclamation in 1941, the entire air space and waters surrounding Culebra, including the civilian municipality, were interdicted by the U.S. Navy. <u>See</u> <u>Feliciano</u> v. <u>United States</u>, 297 F. Supp. 1356 (D.P.R. 1969), <u>aff'd</u>, 422 F.2d 943 (1st Cir. 1970);

Since the Government of the United States took possession of these lands, the U.S. Navy has almost continuously conducted military exercises involving air, naval, and field artillery bombardments with live and inert munitions on both Culebra and Vieques, as well as amphibious and land operations by the Marine Corps, the latter of which predominantly took place in Vieques.[15] The seething, unresolved controversies generated by these activities, affecting the daily lives of the civilian residents of Vieques and Culebra, as well as a significant number of the general population of Puerto Rico, led to predictable consequences.

In 1975, the Navy was forced to terminate its operations in Culebra[16] and to transfer its aerial and naval bombardments to Vieques. Because of the resulting increased intensity of these activities in Vieques[17] -- an island with a substantially larger

---

Exec. Order No. 8684, 6 Fed. Reg. 1016 (Feb. 14, 1941) (designating the "Culebra Island Naval Defensive Sea Area").

[15] See Romero-Barceló, 478 F. Supp. at 659-60 (describing use of beaches by Marines for amphibious landings).

[16] Exec. Order No. 11,886, 40 Fed. Reg. 49,071 (Oct. 21, 1975) (abolishing the "Culebra Island Naval Defensive Sea Area" established by Executive Order No. 8684, and noting that the "Culebra Island Naval Airspace Reservation" had been since revoked by the Federal Aviation Administration at the Navy's request). See Abstract, N.Y. Times, Oct. 20, 1975, available at 1975 WLNR 56658 (reporting on departure of Navy from Culebra).

[17] See Romero-Barceló, 478 F. Supp. at 656 n.24 (noting evidence of increase in the intensity of operations in Vieques between 1975 and 1979, reflected in the amount of artillery used, naval gunfire realized, and air-to-ground ordnance delivered).

civilian population than that of Culebra -- matters were exacerbated to the point that these actions became politically untenable for the Navy,[18] forcing it to totally close its ranges and maneuvering areas in Vieques in 2003.[19] Finally, in 2004, the Navy abandoned the support base for the Culebra/Vieques complex -- the Roosevelt Roads Naval Air Station[20] in nearby Ceiba, Puerto Rico.[21]

---

[18] See generally Kathleen Margareta Ryder, Vieques' Struggle for Freedom: Environmental Litigation, Civil Disobedience, and Political Marketing Proves Successful, 12 Penn St. Envtl. L. Rev. 419, 423-35, 437-43 (2004) (describing unsuccessful litigation by the Commonwealth government, Puerto Rican environmental organizations, and private citizens to enjoin the activities of the Navy in Vieques; describing rise of civilian protest movement).

[19] See Resolution Regarding Use of Range Facilities in Vieques, Puerto Rico (Referendum), 65 Fed. Reg. 5729 (Jan. 31, 2000) (restricting use of Vieques training range to 90 days per year pending a referendum by the citizens of Vieques on the future of Navy exercises on the island, giving citizens a choice between allowing naval training indefinitely in return for $50 million for infrastructure development or requiring the Navy to leave by May of 2003); Press Release, Dep't of Defense, Department of Navy Transfers Vieques Property (Apr. 30, 2003), available at http://www.defense.gov/releases/release.aspx?releaseid=3798 (last visited Nov. 22, 2011) (announcing Navy's transfer of all real property on the eastern end of Vieques to the administrative jurisdiction of the Department of Interior, requiring development of the land for use as a wildlife refuge and that Navy retain responsibility for environmental cleanup); Iván Román, Navy Ships Out of Island, Vieques Residents Cheer End of Drills, Face Health Woes, Chi. Trib., May 1, 2003, available at 2003 WLNR 15336471.

[20] At the time, Roosevelt Roads was one of the largest U.S. naval bases in the world.

[21] Department of Defense Appropriations Act of 2004, § 8132(a), 117 Stat. 1054 (2003) (mandating closure of Naval Station Roosevelt Roads within six months of enactment); see Big U.S. Navy Station in Puerto Rico Closes, Seattle Times, April 1, 2004, available at 2004 WLNR 1778245.

This Court has played an important role in this unhappy tale, having contributed in no small way to buttressing one side of the United States-Culebra/Vieques conundrum in a plethora of civil

and criminal cases,[22] the outcome of which, in

_____

[22] See, e.g., Abreu v. United States, 468 F.3d 20 (1st Cir. 2006) (appeal from dismissal of FTCA action against the Navy for violation of RCRA); United States v. Pérez-González, 445 F.3d 39 (1st Cir. 2006) (appeal from conviction for destruction of government property in the U.S. Naval Training Facility in Vieques); United States v. Zenón-Encarnación, 387 F.3d 60 (1st Cir. 2004) (affirming conviction for trespass on military base in Vieques); United States v. Ventura-Meléndez, 321 F.3d 230 (1st Cir. 2003) (same); United States v. Figueroa-Arenas, 292 F.3d 276 (1st Cir. 2002) (appeal from $500 fine imposed on lawyer for alleged misconduct while defending a client accused of trespassing in Vieques military reservation); United States v. Mulero-Joubert, 289 F.3d 168 (1st Cir. 2002) (reversing conviction for trespass on military base in Vieques); United States v. Zenón-Rodríguez, 289 F.3d 28 (1st Cir. 2002) (affirming conviction for trespass on military base in Vieques); United States v. Ayala, 289 F.3d 16 (1st Cir. 2002) (same); United States v. Guzmán, 282 F.3d 56 (1st Cir. 2002) (same); United States v. De Jesús, 277 F.3d 609 (1st Cir. 2002) (same); United States v. Burgos-Andújar, 275 F.3d 23 (1st Cir. 2001) (same); United States v. Silva-Rosa, 275 F.3d 18 (1st Cir. 2001) (same); United States v. Ventura-Meléndez, 275 F.3d 9 (1st Cir. 2001) (same); United States v. Sued-Jiménez, 275 F.3d 1 (1st Cir. 2001)(same); Water Keeper Alliance v. United States Dep't of Def., 271 F.3d 21 (1st Cir. 2001) (appeal from denial of request for preliminary injunction to stay Navy's military exercises in Vieques); United States v. Maxwell, 254 F.3d 21 (1st Cir. 2001) (affirming conviction for trespass on military base in Vieques); United States v. Sharpton, 252 F.3d 536 (1st Cir. 2001) (same); United States v. Saadé, 800 F.2d 269 (1st Cir. 1986) (appeal from determination that 33 C.F.R. § 204.234 did not unreasonably interfere with or restrict the food fishing industry, where defendants had been convicted for entering restricted waters during naval gunnery practice); United States v. Puerto Rico, 721 F.2d 832 (1st Cir. 1983) (affirming district court's order denying the Commonwealth's motion to dismiss the Navy's suit challenging a determination by the Commonwealth's Environmental Quality Board that the Navy was violating water quality standards); United States v. Zenón, 711 F.2d 476 (1st Cir. 1983) (denial of appeal from issuance of permanent injunction forbidding unlawful entrance in Vieques restricted areas); Romero-Barceló v. Brown, 655 F.2d 458 (1st Cir. 1981) (appeal arising from post-judgment proceedings); United States v. Saadé, 652 F.2d 1126 (1st Cir. 1981) (affirming in part conviction for trespass on military base in Vieques and remanding to determine whether danger zone regulation unreasonably interfered with food-fishing industry); United States v. Parrilla-

retrospect, only served to fuel an already hot fire.

This Court's dissonant tune reaches a crescendo in the present case with the majority's incorrect finding that Plaintiffs' complaint fails to allege sufficient facts to overcome the government's motion to dismiss pursuant to Rule 12(b)(1). As will be shown, the majority fails to properly credit Plaintiffs' supported jurisdictional averments, and goes too far in carving out an unwarranted exception to the Federal Tort Claims Act's (FTCA) waiver of sovereign immunity for the exercise of military authority. I am thus compelled to dissent.

**I.**

On September 5, 2007, Juanita Sánchez, on behalf of her minor child, Debora Rivera-Sánchez, and 7,124 additional residents of Vieques, filed their complaint in this case.[23] The United States responded by filing a motion to dismiss pursuant to Fed. R. Civ. P.

---

Bonilla, 648 F.2d 1373 (1st Cir. 1981) (reversing conviction for trespass on military base in Vieques); Romero-Barceló, 643 F.2d 835 (1st Cir. 1981) (reversing district court's denial of injunction to stop military operations in Vieques that were found to be in violation of NEPA); United States v. Parrilla-Bonilla, 626 F.2d 177 (1st Cir. 1980) (disallowing disqualification of sentencing judge in case involving conviction for trespassing on Vieques military property); Feliciano v. United States, 422 F.2d 943 (1st Cir. 1970) (enforcement of Presidential order creating "Culebra Island Naval Defensive Sea Area" against civilian population of Culebra not a taking of plaintiff's property or violation of right to travel or due process).

[23] The complaint was originally filed in the District Court for the District of Columbia. It was transferred to the District of Puerto Rico on March 16, 2009.

12(b)(1), alleging lack of subject matter jurisdiction. The district court granted this motion, relying principally on our decision in Abreu v. United States, 468 F.3d 20 (1st Cir. 2006), in which we held that an action for damages was not available under the FTCA for a violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 et seq.

Although the majority pays lip service to the well-established rule that on a Rule 12(b)(1) motion a court must "credit the plaintiff's well-pled allegations and draw all reasonable inferences in the plaintiff's favor," Maj. Op. at 13 (citing Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010)), its application of this precept to the instant case is permeated with an unwarranted skepticism of Plaintiffs' claims, a condition which results in an improper under-valuation of the allegations in the complaint. I will therefore, first, explore the legitimate boundaries of Rule 12(b)(1), and second, apply them to the allegations of Plaintiffs' complaint and their relevant jurisdictional averments.

This Court "afford[s] plenary review to a district court's order of dismissal for lack of subject matter jurisdiction." Muñiz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003). "At the pleading stage, such an order is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." Id. In

-46-

assessing whether the plaintiff has put forward an adequate basis for jurisdiction, "the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in [the plaintiff's] favor, and dispose of the challenge accordingly." Valentín v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). See also Merlonghi, 620 F.3d at 54 (on a motion to dismiss for lack of subject matter jurisdiction the court may also "consider whatever evidence has been submitted, such as [] depositions and exhibits") (quoting Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)).

This standard is the same as is applied on a Rule 12(b)(6) motion. See McCloskey v. Muller, 446 F.3d 262, 266 (1st Cir. 2006) ("Under either [Rules 12(b)(1) or 12(b)(6)], we review the lower court's order de novo, accepting the plaintiffs' well-pleaded facts as true and indulging all reasonable inferences in their behoof."). We recently clarified in Ocasio-Hernández v. Fortuño, 640 F.3d 1 (1st Cir. 2011), how this "well-pleaded facts" standard should be applied, and set forth a highly relevant discussion of what the Supreme Court's specific determinations were in the two leading cases in this area of the law, Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009), as to a plaintiff's actual burden

at the motion to dismiss stage.  Importantly, Ocasio-Hernández indicates that under Twombly, "'we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'"  640 F.3d at 8 (quoting Twombly, 550 U.S. at 570).

Per the Iqbal decision, we described the "two-pronged approach . . . implicit in [] Twombly," pursuant to which we must first separate a complaint's factual allegations from its legal conclusions. Ocasio-Hernández, 640 F.3d at 10.  "The second prong . . . requires a reviewing court to accept the remaining factual allegations in the complaint as true and to evaluate whether, taken as a whole, they state a facially plausible claim." Id. at 10-11 (emphasis added).  Moreover, "[n]on-conclusory factual allegations . . . must [] be treated as true, even if seemingly incredible." Id. at 12 (citing Iqbal, 129 S. Ct. at 1951).  We emphasized that the court should not "attempt to forecast a plaintiff's likelihood of success on the merits," and instead should "evaluate the cumulative effect of the factual allegations." Id. at 13-14.  In short, "[t]he question confronting a court on a motion to dismiss is whether all the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's [sic] entitlement to relief plausible." Id. at 14 (relying on Twombly, 550 U.S. at 569 n.14).

Applying these guidelines to the allegations raised in the complaint and to all of the relevant evidence proffered in support of jurisdiction, Merlonghi, 620 F.3d at 54, it is clear that Plaintiffs in this case have met their jurisdictional burden. It is also obvious that the majority has failed to judge the complaint by the rules that have just been recited.

## II.

I begin with the incontrovertible proposition that Plaintiffs are suing under the FTCA, not the Clean Water Act (CWA).[24] As will be discussed infra, however, the Navy's alleged

[24] According to the district court and the majority of this panel, our decision in Abreu, read in conjunction with Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1 (1981), requires the conclusion that an action for damages in this case is foreclosed under the FTCA if it is based on the violation of a mandatory permitting requirement under the CWA. Maj. Op. at 17-21. See Abreu, 468 F.3d at 32 (finding that "allowing the recovery of damages in a FTCA suit, based on the violation of a mandatory permitting requirement" under a federal statute that precludes compensatory damages "would undermine the intent of Congress"); see also Sea Clammers, 453 U.S. at 18 (holding that the structure and legislative history of the CWA indicated there is no implied cause of action for compensatory damages under the citizen-suit provision of the Act). However, I believe the majority's conclusion does not account for the significant factual differences between this case and Abreu, noted infra, which places this case outside the confines of such a holding. Among those differences is the fact that the complaint in this case contains various alternative theories of liability, and was not "specifically designed to achieve an end run around" congressional limitations to actions for damages under the CWA. Abreu, 468 F.3d at 32 (noting complaint originally brought for Navy's RCRA violations, which claims were dismissed, and that plaintiffs continued to base their state-law tort claims on the RCRA standard of liability, triggering court's concern that the FTCA claim at issue had been "specifically designed" to undermine congressional limitations on RCRA private damages actions). It

violations of its National Pollutant Discharge Elimination System (NPDES) permit, as well as other mandatory directives, are what allow Plaintiffs to proceed under the FTCA because their law suit falls outside the discretionary function bar of the statute. See United States v. Berkovitz, 486 U.S. 531, 544 (1988) ("When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply."). Under the FTCA the United States "shall be liable . . . relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674. This is a liability that includes "the military departments" and "members of the military or naval forces of the United States." Id. § 2671. The FTCA does not apply, however, to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government . . . ." Id. § 2680(a). Thus, any claim based on the law of the jurisdiction where the alleged tort takes place is a valid FTCA claim, provided that an administrative claim has been duly filed pursuant to 28 U.S.C. § 2675 (requiring exhaustion of

---

should also be noted that the FTCA claim in Sea Clammers was dismissed at the district court level because plaintiffs had failed to file administrative claims before proceeding to the courts, and thus the FTCA claims were not part of the Sea Clammers rationale. Sea Clammers, 458 U.S. at 8.

administrative remedies), and that the discretionary function exception (or any other statutory exception) does not apply.[25]

Leaving aside for the moment the issue of the discretionary function exception, Plaintiffs allege eight causes of action under Puerto Rico law which, if proven, would allow them to recover compensatory damages from the Navy as if it were "a private individual in like circumstances." Id. § 2674. Of these, Count I, alleging negligence under Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141, claims, among other things, that despite the Navy's knowledge that its various activities created dangerous, toxic conditions within the Atlantic Fleet Weapons Training Facility (AFWTF) -- as the Vieques Naval Reservation was officially called -- the Navy negligently failed to warn the citizens of Vieques of the presence and harmful effects of the "numerous known carcinogenic compounds and substances, heavy metals, and other known dangerous substances, compounds, elements, and[] materials" present in the AFTWF and surrounding waters. Plaintiffs also argue that the Navy knowingly invited the residents of Vieques to enter onto its contaminated property for the purpose of fishing and cattle herding.

---

[25] Plaintiffs allege in the complaint, and it is uncontested, that they exhausted the administrative claims process; that they received on March 12, 2007 the Navy's final denial letter; and that thereafter they filed their complaint within the six-month time period prescribed by 28 U.S.C. § 2675(a).

Article 1802 of Puerto Rico's Civil Code imposes liability for tort damages on "[a] person who by an act or omission causes damage to another through fault or negligence." P.R. Laws Ann. tit. 31, § 5141. Liability turns on three basic elements: (1) evidence of physical or emotional injury, (2) a negligent or intentional act or omission (the breach of duty element), and (3) a causal nexus between the injury and the defendant's act or omission (i.e., proximate cause). Vázquez-Filippetti v. Banco Popular de P.R., 504 F.3d 43, 49 (1st Cir. 2007) (citing Torres v. KMart Corp., 233 F. Supp. 2d 273, 277-78 (D.P.R. 2002)). "As is true in most jurisdictions, foreseeability is a central issue in these cases, as it is an element of both breach of duty and proximate cause." Id. at 49 (citation omitted). "[A] defendant only breaches his duty if he acted (or failed to act) in a way that a reasonably prudent person would foresee as creating undue risk." Id. (citation omitted); see also Malavé-Félix v. Volvo Car Corp., 946 F.2d 967, 971-72 (1st Cir. 1991) (as to proximate cause, "[a] person is liable for injuries that a prudent person reasonably could anticipate") (citing Pacheco v. A.F.F., 12 P.R. Offic. Trans. 367, 372, 112 P.R. Dec. 296 (1982); Jiménez v. Pelegrina-Espinet, 12 P.R. Offic. Trans. 881, 888, 112 P.R. Dec. 700 (1982)).

As previously detailed, since the 1940s, and until 2003, the Navy owned approximately 22,000 of Vieques's 33,000 acres and employed them for use as a training ground and live ordnance range.

At a minimum, at least as far back as 1979, when Romero-Barceló v. Brown, 478 F. Supp. 646 (D.P.R. 1979), aff'd in part, vacated in part, 643 F.2d 835 (1st Cir. 1981), rev'd sub nom. Weinberger v. Romero-Barceló, 456 U.S. 305 (1982), was decided,[26] the Navy was made aware of the maximum concentrations of various toxic substances that were legally allowed to be deposited in the waters of Vieques.[27]  Pursuant to my order in that case, the Navy sought an NPDES permit.  Thereafter, Permit No. PRG990001 (the "Permit") was issued to the Navy on October 30, 1984 for its AFWTF

---

[26]  Romero-Barceló v. Brown was the result of a trial lasting three months in which sixty-three witnesses testified, hundreds of exhibits became part of the record, and two visual inspections took place, including an underwater viewing of the numerous unexploded ordnance present in the waters surrounding Vieques.  I -- as the district judge that heard the evidence in that case -- concluded that the Navy had violated several federal statutes, including the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321, et seq., and the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. §§ 1251-1376, because it engaged in a "major federal action significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), without having prepared and filed an environmental impact statement (EIS), and because it had discharged ordnance into the waters of Vieques without first securing a NPDES permit, as required by 33 U.S.C. § 1311(a).  Romero-Barceló, 478 F. Supp. at 703-05, 663-67.  Although I exercised my discretion and did not issue an injunction prohibiting the continuation of military activities in Vieques as the plaintiffs in that case requested, I ordered the Navy to file an EIS and to otherwise comply with the FWPCA by seeking an NPDES permit "with all deliberate speed."  Romero-Barceló, 478 F. Supp. at 708.  These orders were approved by the Supreme Court in Weinberger v. Romero-Barceló, 456 U.S. 305 (1982).

[27]  See Romero-Barceló, 478 F. Supp. at 666 (indicating that maximum concentrations included (in mg/1 measurement): arsenic, 0.15; barium, 1.0; cadmium, 0.005; chromium, 0.05 (hexavalent) and 0.30 (trivalent); copper, 0.05; iron, 0.200; lead, 0.015; and mercury, 0.001; among others).

operations. See Authorization To Discharge Under the National Pollutant Discharge Elimination System, 49 Fed. Reg. 43,585-02 (Oct. 30, 1984). This document, which is part of the record in this case, purports to regulate the Navy's discharge of ordnance into the waters of Vieques during training exercises. It incorporated a 1983 Water Quality Certificate from the Puerto Rico Environmental Quality Board (EQB) and required the Navy to meet either of the following limitations: (1) water quality-based numerical limits, "as required by the Puerto Rico [EQB] Certification of October 11, 1983" which assured compliance with EQB's water quality standards, as provided by Section 401(d) of the CWA, or (2) natural background concentrations (NBCs), whichever is higher. Id. at 43,586. The Permit also required that "[a]t no time shall the maximum values contained in the effluent exceed the water quality standards after mixing with the receiving water." Id. at 43,589.

Plaintiffs allege in their complaint, and the record reflects, that from 1985 through 1999, the Navy reported measurements of discharges of heavy metals and other materials into the waters of eastern Vieques, which contained lead, barium, cadmium, arsenic, boron, cyanide, hexavalent chromium, and thirteen other substances in violation of the CWA and the Puerto Rico EQB's water quality standards. On August 27, 1999, the EPA determined that the Navy had violated the Permit and sent notice of these

violations in a letter by Deputy Regional Director for EPA-Region II, William Muszynski, addressed to Assistant Secretary of Defense Frank Rush. The letter states that, based on the Navy's own Discharge Monitoring Reports (DMRs) for the period of 1994 through April 1999, the EPA had "documented 102 exceedances of the water quality-based permit limits" for toxic substances, including: boron, cadmium, chromium (hexavalent and total), copper, iron, lead, manganese, mercury, oil and grease, phenolics, selenium, silver, sulfide, and zinc. The EPA also stated that due to the Navy's monitoring deficiencies "[t]he potential for a greater number of actual violations exists than is evidenced in the DMRs." Thereafter, on September 15, 1999, the Navy was formally notified through Captain J.K. Stark, the Commanding Officer of the Roosevelt Roads Naval Air Station and under whose direction and command the Vieques AFWTF operated, that the Navy "ha[d] violated the Clean Water Act."

Plaintiffs claim that notwithstanding the "web of reporting requirements . . .[, which] should have triggered a warning to the people of Vieques, many of whom live off the land by eating fish and fowl and local wildlife," the Navy not only failed to warn Plaintiffs of these hazards, but in fact facilitated their exposure to them by allowing fishermen and cattlemen to enter the AFWTF to engage in these activities. Plaintiffs proffered an article published in 2005 by the International Journal of

Environmental Research and Public Health, which indicates that "[f]rom 1984 to 2000, the US Navy allowed local farmers to graze cows in the eastern part of Vieques including at the AFWTF. The potential for direct exposure and the impact on human health is exemplified by this pathway."[28] This <u>assertion</u> is supported by language in the Range Manual for the AFWTF, also proffered into evidence, indicating the following at parts 404(d) and (e):

> Livestock. Cattle graze on land extending into the [Eastern Maneuvering Area]. Cattle and wild horses often wander into the [Live Impact Area] and should never be intentionally fired upon . . . .

> Fishing Activity. Fish traps are set off the eastern half of Vieques . . . Fishermen often set traps in OPAREAs A, B, C, D and H of R-7104 . . . and recover traps when the range is cold. Surface units shall watch for these floats to avoid running them over.

The Range Manual further indicates that "[t]he [i]nner range is closed every Tuesday and Friday from 0700Q - 0900Q to permit local fishermen to retrieve fishing traps from adjacent waters." It is <u>alleged</u> that this pattern of allowing fishermen and cattlemen to enter the AFWTF not only exposed those citizens directly to the hazards of the contaminants, but also subjected the rest of the residents of Vieques to the same, such as Plaintiffs who consumed the products of fishing and grazing activities.

---

[28] <u>See</u> A. Massol-Deyá, et al., <u>Trace Elements Analysis in Forage Samples from a US Navy Bombing Range (Vieques, Puerto Rico)</u>, 2 Int'l J. Envtl. Res. & Pub. Health 263, 264 (2005).

Indeed, the complaint provides the following allegations: detection of benzene and toluene in the groundwater under the civilian sectors of Vieques; detection of high concentrations of lead, cadmium, manganese, copper, cobalt, and nickel in the vegetation; high concentrations of arsenic, iron, nickel, zinc, cadmium, cobalt, lead, and copper "in the sea grasses on and surrounding Vieques"; high concentrations of cadmium and lead detected in the crab population; and high amounts of mercury, selenium, arsenic, and zinc detected in fish populations. Additionally, the Plaintiffs reference studies conducted in February and March of 2000 by biologist Dr. Arturo Massol-Deyá and radiochemist Elba Díaz, who found unacceptably high levels of cadmium, nickel, cobalt, and manganese in crabs. According to Dr. Massol, further studies show that vegetables and crops in civilian areas were highly contaminated with lead, cadmium, copper, and other metals; plants had ten times more lead and three times more cadmium than samples from the Puerto Rico mainland, as well as excessive amounts of nickel, cobalt, magnesium, and copper; and goats grazing in the AFWTF's grasslands contained five to seven times more cadmium, six times more cobalt, and five times more aluminum than those found in the Puerto Rican mainland.

The complaint further claims specific harm to Vieques residents, alleging "[t]hat according to hair studies done to determine the presence of heavy metals in humans on Vieques[,] the

-57-

following contaminants were discovered in Vieques residents: [t]oxic levels of mercury; [t]oxic levels of lead []; [a]rsenic contamination; [c]admium contamination; [a]luminum contamination; [and a]ntimony contamination." The complaint also alleges that "scientific studies have found the following non-native contaminants in high concentrations in the people of Vieques: cobalt, copper, nickel, vanadium, palladium, iron, magnesium, manganese, silicon, cerium, dysprosium, lanthanum, neodymium, praseodymium, silver, ytterbium, and tellurium." Specifically, studies of hair samples from Vieques residents collected by Dr. John Wargo, a professor of Risk Analysis and Environmental Policy at Yale University, showed high levels of mercury and other contaminants, including lead, cadmium and arsenic; studies carried out by Dr. Carmen Ortiz Roque, an epidemiologist and physician, also confirmed these findings. It is additionally claimed that residents of Vieques experience a 30% higher cancer rate, a 381% higher hypertension rate, a 95% higher cirrhosis rate, and a 41% higher diabetes rate than persons in the rest of Puerto Rico. Further, studies reflect that as a result of the Navy's activities in Vieques, the island's infant mortality rates have increased since 1980, and babies born in Vieques have a 33% low-weight rate, as well as a pre-term delivery rate that is higher than in mainland Puerto Rico.

The complaint further alleges that tests performed on hair samples from Plaintiff Debora Rivera-Sánchez, a 9-year-old female resident of Vieques, found toxic levels of lead, cadmium, and aluminum; Plaintiff Lionel Colón-Adams, a 9-year-old male resident of Vieques, similarly alleges that tests performed on his hair samples yielded toxic levels of aluminum, arsenic, lead, and cadmium.  Plaintiff Rivera-Sánchez also alleges that she has been diagnosed to be suffering from anemia and stomach problems, while Plaintiff Colón-Ayala claims to have been diagnosed with respiratory and stomach problems.  Both plaintiffs claim that, according to the Agency for Toxic Substances and Disease Registry (ATSDR) -- which is a federal public health agency that is a part of the U.S. Department of Health -- the toxic elements found in their hair samples correlate with the diseases from which they are suffering.[29]

Thus, in brief, given the record before us on appeal and considering the applicable standard for Rule 12(b)(1) motions, we must accept as true the following factual allegations:

---

[29]  There are a total of 7,125 Plaintiffs in this case, all with specific allegations that are similar in nature to those alleged by Plaintiffs Rivera-Sánchez and Colón-Ayala.  These range from diagnoses of asthma, other respiratory illnesses, and high blood pressure, to cancer, kidney problems, and liver disease. All of Plaintiffs' hair samples present toxic concentrations of heavy metals which are, in each case, indicated to correlate to the diagnosed diseases.  These allegations can be found in ¶¶ 36-7151 of the complaint.

(1) The Navy has been conducting operations in and around Vieques since the early 1940s.

(2) These operations have caused substantial toxic substances, among them arsenic, boron, cyanide, hexavalent chromium, and thirteen other toxic substances (e.g., benzene and toluene), to be introduced into the Vieques environment, including into the air, soil, sea, ground water, vegetation, sea grasses, fauna, and fish in and around the island, both within the AFWTF and the civilian sectors.

(3) Since at least 1979, the Navy has been aware and on notice of the toxic impact of its activities in the AFWTF. Nevertheless, it has not only continued to pollute the AFWTF with the aforementioned substances, it has allowed this pollution to impact the civilian sectors of Vieques, including Plaintiffs. Additionally, it has aggravated the consequences of this situation by inviting and allowing commercial fishing and cattle grazing to take place within the AFWTF; by failing to warn Plaintiffs of the dangerous conditions to which they were being subjected by their entry into the AFWTF; and by failing to warn the Plaintiffs that their consumption of plants, animals, and fish that had been exposed to and contaminated by the toxic substances found in the AFWTF could cause serious injury or death to them.

(4) Since at least 1979, the Navy has been required to comply with NEPA (for engaging in actions that "significantly

affect[] the quality of the human environment," 42 U.S.C. § 4332(C)) and to seek and comply with an NPDES permit. Notwithstanding this obligation, since at least 1985 the Navy's toxic discharges into the Vieques waters exceeded the allowable limits under the Permit, which violations were duly notified to the Navy by the EPA, with no corrective action being taken.

(5) Plaintiffs are suffering from diseases and injuries that were caused by the toxic substances that the Navy placed in the environment and to which Plaintiffs have been directly and indirectly exposed.

Bearing in mind that "[i]n ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the district court must construe the complaint liberally," Aversa, 99 F.3d at 1209-10, there is no question but that these facts, if proven at trial, present a plausible cause of action under Article 1802 of the Puerto Rico Civil Code. Under Puerto Rico law, the failure of a property owner to warn an invitee of the existence of known dangerous conditions on his or her property exposes the property owner to liability for damages.[30]

---

[30] See Rivera-Santiago v. United States, No. 08-1266 (RLA), 2009 WL 702235, at *5 (D.P.R. Mar. 11, 2009) (discussing Puerto Rico precedent regarding owner's liability as requiring (1) "the existence of a dangerous condition which [(2)] proximately caused the injuries alleged and that [(3)] the defendant had either actual or constructive knowledge of said dangerous condition." (citations omitted)); see also Mas v. United States, 984 F.2d 527, 530 (1st Cir. 1993) (discussing Puerto Rico jurisprudence establishing that property owners are responsible for the safekeeping of business

Even outside the realm of premises liability,[31] the factual allegations at issue in this case sufficiently articulate a claim of negligence as "failure to exercise due diligence to avoid foreseeable risks," Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc., 124 F.3d 47, 50 (1st Cir. 1997), which is plausibly the proximate cause of the injuries inflicted upon the plaintiffs.

**III.**

The Navy attempts to shield itself from liability by invoking the "discretionary function" exception. Although the government did not raise this defense in its answer to Plaintiffs' administrative claim, presenting it for the first time in their motion to dismiss, the government is allowed to engage in such sandbagging tactics. See Irving v. United States, 162 F.3d 154, 160 (1st Cir. 1998) (en banc).

The majority concludes that the Navy's failure to warn Plaintiffs of the dangers previously described is not actionable because the decision regarding whether to warn was an exercise of

_____

invitees and are liable for injuries resulting from dangerous conditions of which the owner has either actual or constructive knowledge).

    [31] See Rivera-Pérez v. Cruz-Corchado, 19 P.R. Offic. Trans. 10, 119 P.R. Dec. 8 (1987) (suggesting that the difference between an invitee, a franchisee, a licensee, or a trespasser is not relevant to the determination, under Puerto Rico law, of whether an owner is liable for damages sustained by others on his or her property; tort liability in civil law jurisdictions turns simply on whether the owner negligently or knowingly caused the plaintiff a foreseeable harm).

discretion, and thus the discretionary function exception applies. I disagree. In considering the application of the discretionary function exception, the Court must first identify the conduct at issue. Montijo-Reyes v. United States, 436 F.3d 19, 24 (1st Cir. 2006). The Court then "asks two interrelated questions: (1) Is the conduct itself discretionary? (2) If so, does the exercise of discretion involve (or is it susceptible to) policy-related judgments?" Id. (quoting Muñiz-Rivera, 326 F.3d at 15) (internal quotation marks omitted).

## A.

As to the first question, "[t]he requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" United States v. Gaubert, 499 U.S. 315, 322 (1991) (quoting Berkovitz, 486 U.S. at 536). "[I]f the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the . . . exception to protect." Berkovitz, 486 U.S. at 536.

In this case, Plaintiffs allege the existence of mandatory rules, specific in nature, which required Navy compliance therewith, but which were not honored by the Navy and were the cause of Plaintiffs' injuries. To begin with, at least since Romero-Barceló in 1979, the Navy was aware that it was covered by

the mandatory provisions of NEPA, that it was polluting the Vieques environment, and that it was required under the CWA to seek the NPDES permit and comply with its provisions. It bears noting that the rulings and orders in Romero-Barceló regarding the Navy's violations and compliance requirements were affirmed by both this Court and the Supreme Court. See Romero-Barceló, 643 F.3d at 861-62 (First Circuit decision affirming district court's finding that the Navy had "utterly disregarded" statutory mandates and remanding for issuance of an order that the Navy "take all necessary steps to insure that no ordnance is discharged into the coastal waters of Vieques until such time as it obtains a NPDES permit"); see also Weinberger, 456 U.S. at 307-11, 320 (affirming the district court's findings and reversing the Court of Appeals on other grounds). Plaintiffs specifically alleged in their complaint, and proffered evidence to the effect, that the Navy nevertheless continued to exceed mandatory minimums under the CWA and the Puerto Rico EQB's water quality standards, ignoring admonitions by the EPA, as a result of which Plaintiffs-invitees were injured and Plaintiffs-civilian bystanders were collaterally damaged. Thus, the damage claimed here is, in essence, allegedly caused by the Navy's affirmative actions of inviting civilians onto a known danger within the government's control, and the Navy's engagement in violations of mandatory regulations and policies. This is an important distinction between the present situation and the Abreu

case, in which no claim was made that the plaintiffs' injuries were caused by the Navy's invitations or failure to warn.

Furthermore, this is a suit under the FTCA, which only has one exception that is arguably relevant to the case before us, the discretionary function exception of 28 U.S.C. § 2680(a). The issue in this case is not whether the CWA or NEPA created a private cause of action for damages. Cf. Sea Clammers, 453 U.S. 1 (1981) (addressing the lack of an implied cause of action for compensatory damages under 33 U.S.C. § 1365(a), the citizen-suit provision of the CWA). Indeed, the CWA, NEPA, and other regulations are of relevance only in determining whether the Navy comes within the discretionary function exception. This Court is bound by the higher authority of Gaubert and Berkovitz, which establish the inapplicability of the discretionary function exception when there are mandatory legal requirements, such as exist in the present case by reason of court rulings (Romero-Barceló), federal statutes (e.g., NEPA and CWA), and specific permit standards (e.g., the NPDES permit), all of which the Navy has allegedly disregarded to the claimed prejudice of Plaintiffs.

The CWA provides that "[e]ach department . . . of the executive . . . engaged in any activity resulting . . . in the discharge or runoff of pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements . . . respecting the control and abatement of water pollution in

-65-

the same manner and to the same extent as any nongovernmental entity . . . ." 33 U.S.C. § 1323(a). It bears emphasizing that the Navy could have requested a presidential exemption from compliance with this provision for its military exercises on Vieques, yet it never did so. See id. ("The President may exempt any effluent source of any department, agency, or instrumentality in the executive branch from compliance with any such a requirement if he determines it to be in the paramount interest of the United States to do so . . ."). Instead, the Navy had to be ordered to procure an NPDES permit, which it nevertheless subsequently violated. In my view, the Navy's failure to make use of this statutory exemption -- preferring instead to flaunt the statute's mandates, thereby allegedly causing harm to the citizenry of Vieques -- militates against the creation of a special category for the Navy as a regulated party to subvert the FTCA's general waiver of sovereign immunity. See infra at 33-36. More importantly, the fact that Congress created a specific mechanism, i.e. Presidential exception, for the Navy to seek inapplicability of this environmental statute to its operations where appropriate, clearly indicates that, sans presidential exception, the Navy was required to comply with the same, as held in Romero-Barceló. See also 40 C.F.R. § 1506.11 (providing, in the context of NEPA, that "[w]here emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions

of [NEPA regulations], the Federal agency taking the action should consult with the [Council on Environmental Quality, within the Executive Office of the President] about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.").

Thus, the majority's creation of this lacuna is totally unsupported by law. If proven, Plaintiffs' contentions would make the government liable for the resulting tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

It is worth noting that Plaintiffs make additional allegations in their complaint to support their theory that the Navy is liable under the FTCA for their injuries from past contamination and that the discretionary function exception does not shield it from liability under Gaubert. As the majority recognizes, see Maj. Op. at 9-10, Plaintiffs allege that the Navy violated permits concerning depleted uranium, relying on a letter from the Navy to the Nuclear Regulatory Commission (NRC)[32] that describes an event that took place in 1999 in which two aircraft fired at least 263 depleted uranium 25 mm rounds on Vieques. The

_____

[32] The majority incorrectly states that the letter was sent by the NRC to the Navy, see Maj. Op. at 9, but a review of the referenced document reveals that it was sent by Commander G.A. Huggins, Executive Secretary of the Naval Radiation Safety Committee to the NRC for Region II.

-67-

letter indicates that "[t]he firing of [depleted uranium] ammunition on Navy or Marine Corps firing ranges is a violation of the Navy's Master Material License No. 45-23645-01NA, and specifically, the Naval Radioactive Material Permit No. 13-00164-L1NP pertaining to depleted uranium." Plaintiffs further allege that as of 2001, only 116 of the 263 rounds had been found and removed. They also allege that studies have found "significantly higher than background radiation levels about a mile from where the [depleted uranium] was reportedly fired," and that this suggests uranium has been used "on several other occasions on Vieques," in violation of the referenced permits.

The majority finds that these allegations do not sustain Plaintiffs' FTCA claim because they are "insufficiently supported," and that "[Plaintiffs] have failed to adequately allege that the challenged conduct was non-discretionary, assuming Gaubert would apply here." Maj. Op. at 24. I believe that in reaching this conclusion the majority fails to properly credit Plaintiffs' averments, applying a higher pleading standard than is warranted at the motion to dismiss stage. See Aversa, 99 F.3d at 1209-10. What is more, the cases relied upon by the majority to conclude that Plaintiffs "have identified only vague, permissive, or unidentified requirements for government conduct," Maj. Op. at 25, do not involve the alleged violation of permit requirements, as in the case at hand. See Muñiz-Rivera, 326 F.3d at 14-17 (discretionary

-68-

function exception barred claims arising from alleged negligent supervision of construction of homes and failure to erect levees for housing development per applicable regulations); Irving, 162 F.3d at 163-64 (same, in relation to claim of negligently performed workplace inspections).  Plaintiffs have alleged the violation of specific permits regarding the firing of depleted uranium bullets, and specifically cite to a letter in which the Navy admits as much.  These allegations, read in conjunction with the rest of the complaint, bolster the FTCA claim and serve as an independent basis for liability.

**B.**

As to the second inquiry in the discretionary function analysis, the majority holds that the Navy's failure to warn Plaintiffs of the dangers previously described was a decision subject to "policy analysis," and thus concludes that it was an exercise of discretion that exempts the government from liability. See Maj. Op. at 29-30; see also Gaubert, 499 U.S. at 323 ("When properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.") (internal quotation marks and citation omitted).  However, it is not sufficient to simply assert that some policy analysis took place; rather, the government must show that its decision could be the result of a reasonable policy analysis.  See, e.g., Shansky v. United States, 164 F.3d 688, 692 (1st Cir. 1999) (conduct is

-69-

susceptible to policy analysis if "some <u>plausible</u> policy justification could have undergirded the challenged conduct" (emphasis added)); <u>see also</u> <u>Berkovitz</u>, 486 U.S. at 539 ("The discretionary function exception applies only to conduct that involves the <u>permissible</u> exercise of policy judgment." (emphasis added)). I find it hard to see how there is any reasonable or permissible policy analysis that could justify the Navy's failure to warn Plaintiffs of the known dangers created by the Navy's violation of the laws and regulations applicable to its conduct.

In our constitutional system of government the military is subordinate to the civil authority. <u>See</u> <u>Reid</u> v. <u>Covert</u>, 354 U.S. 1, 23 (1957). Thus, whatever discretion the military has, it is not without bounds. When necessary, the courts have stepped in to affirm that there are limits on what can be done in the name of national security. <u>See</u>, <u>e.g.</u>, <u>Boumediene</u> v. <u>Bush</u>, 553 U.S. 723 (2008) (holding that enemy combatants detained at the U.S. Naval Station at Guantanamo Bay, Cuba have the privilege of habeas corpus despite argument that allowing access to courts would interfere with military operations); <u>Youngstown Sheet & Tube Co.</u> v. <u>Sawyer</u>, 343 U.S. 579, 589 (1952) (rejecting President's claim of "inherent power" to use the military to seize property within the United States, despite Government's argument that refusal would "endanger the well-being and safety of the Nation"); <u>Ex Parte Milligan</u>, 71 U.S. (4 Wall.) 2 (1866) (holding unconstitutional the exercise of

military jurisdiction to try and punish a civilian citizen even during an insurrection (the Civil War), where Article III courts were open and functional). I cannot countenance a legal concept or theory that would give the military qua military carte blanche license to harm U.S. citizens through its negligent actions without any consequence.

Contrary to the majority in this case, I find that the situation presented here is similar to Andrulonis v. United States, 952 F.2d 652 (2d Cir. 1991). In Andrulonis, a government researcher contracted rabies after his supervisor failed to warn him about dangerous conditions in the laboratory where he worked. Andrulonis, 952 F.2d at 653. The Second Circuit held that no policy considerations could explain a failure to warn about such "obvious, easily-correctable dangers in experiments." Id. at 655.

The majority distinguishes Andrulonis by arguing that "[u]nlike the obvious, easily correctable danger at issue in Andrulonis, the plaintiffs do not challenge an obvious health hazard or an easily-correctable danger from environmental effects." See Maj. Op. at 31. However, it seems clear that the Plaintiffs are in fact alleging such a danger. The environmental contamination was obvious -- it is undisputed that the Navy knew about it at least as far back as when Romero-Barceló was decided, see supra note 14 -- and the danger to civilians could have been avoided simply by warning them about the risks.

The majority points out that "the Navy . . . must weigh competing interests between 'secrecy and safety, national security and public health.'"  Maj. Op. at 32 (quoting Abreu, 468 F.3d at 26).  However, while I recognize that courts must accord great deference to the military in decisions relating to national security, I cannot accept that courts must be so deferential as to effectively give the military carte blanche to put U.S. citizens in danger when the facts alleged show a clear and simple alternative, warning them of known dangers created by it.  Plaintiffs here are not claiming that the Navy should have revealed classified information about tactics or weapons used at Vieques, or that they should have ceased the military activities.  They are simply claiming that the Navy should have warned them as to the potential danger of entering onto, and being exposed to, contaminated property.  See Pacheco v. United States, 220 F.3d 1126, 1131 (9th Cir. 2002) (finding potential liability under the FTCA for failure to warn invitees to a beach of known dangers); United States v. White, 211 F.2d 79, 82 (9th Cir. 1954) (failure of government as land owner to warn business invitee of danger from unexploded projectiles "could not rationally be deemed the exercise of a discretionary function"); Henderson v. United States, 784 F.2d 942, 943 n.2 (9th Cir. 1986) (safety decisions at government facility are operational in nature, and therefore not within the

discretionary function exception).[33]   Military decision making may

_____

    [33]  In this regard, I further disagree with the majority that
the present case is similar to Loughlin v. United States, 393 F.3d
155 (D.C. Cir. 2004), or In re Consolidated U.S. Atmospheric
Testing Litigation, 820 F.2d 982 (9th Cir. 1987).  See Maj. Op. at
32-34.

     The Loughlin case involved chemical munitions that the Army
had buried at a site near Washington, D.C. during and immediately
following World War I.  393 F.3d at 159-60.  Roughly 70 years
later, the munitions were discovered and the site was found to be
contaminated.  Id. at 160-61.  Plaintiffs in that case, who were
residents and landowners in the area, sued on a failure-to-warn
theory.  They first argued that the Army's initial decision to bury
the munitions without warning the public was not susceptible to
policy considerations.  Id. at 164.   The court rejected this
argument, noting that this decision -- made some 70 years earlier,
in the immediate aftermath of a major war -- "required balancing
'competing concerns of secrecy and safety, national security and
public health.'"  Id. at 164 (quoting Loughlin v. United States,
286 F. Supp. 2d 1, 23 (D.D.C. 2003)).  The plaintiffs also argued
that the government should have warned them about the results of
certain initial tests carried out at the site.  Id. at 164-65.
However, the court noted that the tests in question had not been
conclusive, and that "the agency would have had to weigh several
factors, including the reliability of the test . . . [and] the
possibility of unnecessarily alarming [area] residents should the
danger have ultimately proved unfounded . . . ."  Id. at 165.
     Atmospheric Testing involved claims arising out of the
atmospheric testing of nuclear weapons between the end of World War
II and 1963.  820 F.2d 984.  The specific tests at issue were the
very first atmospheric tests ever conducted, and were conducted in
remote areas, including the Nevada desert and islands in the South
Pacific.  Id. at 985-86.  The plaintiffs, who were soldiers and
civilian contractors who had participated in the testing, sued
under a failure-to-warn theory based on the government's failure to
warn them about the dangers of radiation exposure at the time the
tests were conducted.  Id. at 996.  The court noted that there was
only "fragmentary knowledge" of the risks at the time; further, a
"specific goal" of the tests was to measure the psychological
reactions of troops to the use of nuclear weapons, and as such "the
government needed complete control over information supplied to the
troops."  Id. at 997 & n.17.  Under those circumstances, the court
found that the discretionary function exception applied.  Id. at
997-98.
     The factual and historical context of these cases is
entirely different from the context at issue here.  This is not a

be subject to some deference, but that cannot mean that a military department should remain immune to the nefarious consequences of its decisions upon innocent civilians.

## C.

Finally, there is nothing in the language or history of the FTCA that warrants our Court carving out an exclusion from the liability imposed by Congress for what the majority dubs "regulated parties" (e.g. the military), under the guise of the discretionary function exception to the FTCA. Cf. Abreu, 468 F.3d at 28. The language of 28 U.S.C. § 2680(a) is unambiguous in this respect. The FTCA does not apply to "any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . ." 28 U.S.C. § 2680(a). Interpreting what constitutes "discretionary" conduct is far different from creating by judicial fiat a whole class of governmental entities who are thus given free reign to cause egregious harm to the citizenry.

In Abreu, this Court observed that prior Supreme Court cases invoking the rule of Gaubert had involved suits against the

_____

case involving un-confirmed contamination from munitions buried during wartime, decades earlier. Nor is it a case involving the then-unknown effects of nuclear weapons testing conducted at the start of the Cold War, on soldiers and civilian defense contractors who were themselves involved in the experiments. The plaintiffs here are civilians who had no connection to the Navy's operations, and they have alleged that the Navy failed to warn them about ongoing, known environmental hazards in an area close to civilian population centers.

United States based on the activities of federal regulators, as opposed to regulated parties, and that therefore the Gaubert rule may be "inapplicable to mandatory directives aimed at a regulated party."  See Abreu, 468 F.3d at 27.  I must emphasize that these observations in Abreu constitute dicta -- "observations relevant, but not essential, to the determination of the legal questions then before the court" -- and are thus not binding on this panel. Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 459 (1st Cir. 1992).  The Abreu decision recognized as much.  See Abreu, 468 F.3d at 28 ("[W]e need not decide the difficult question whether the rule of Gaubert is inapplicable to regulated parties for we conclude that the Gaubert rule is inapplicable here for other reasons.").

I suggest it would be more appropriate if the majority adhered to the Supreme Court's admonitions to the effect that FTCA exceptions are not to be construed in an "unduly generous" fashion. See Kosak v. United States, 465 U.S. 848, 853 n.9 (1984) ("[T]he proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify those circumstances which are within the words and reason of the exception -- no less and no more." (internal quotation marks and citation omitted)); Block v. Neal, 460 U.S. 289, 298 (1983) (admonishing against interpretation of exemption to the FTCA waiver of sovereign immunity that would "add to its rigor").  As the Supreme Court

clarified in <u>Dolan</u> v. <u>United States</u>, "the general rule that a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign . . . . [i]s unhelpful in the FTCA context, where unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute, which waives the Government's immunity from suit in sweeping language." 546 U.S. 481, 491-92 (2006) (internal quotation marks and citations omitted).

Furthermore, as previously stated, <u>supra</u> at 66-67, the Navy could have, but did not seek a Presidential exemption. I am hard put to understand why it is entitled to the judicial exemption created from whole cloth by the majority.

Nowhere does the medieval concept of "the King can do no wrong" underlying the doctrine of sovereign immunity, <u>see</u> <u>Donahue</u> v. <u>United States</u>, 660 F.3d 523, 526 (Torruella, J., concerning denial of en banc review), sound more hollow and abusive than when an imperial power applies it to a group of helpless subjects. This cannot be a proper role for the United States of America. Under the circumstances alleged in this case I posit that the application of this anachronistic and judicially invented theory, <u>id.</u>, violates the due process clause of the Constitution. <u>See</u> U.S. Const. amend. V; <u>see also</u> <u>Donahue</u>, 660 F.3d at 526-27 (citing Edwin M. Bouchard, <u>Governmental Responsibility in Tort (pt. VI)</u>, 36 Yale L.J. 1, 17-41

(1926); Erwin Chemerinsky, <u>Against Sovereign Immunity</u>, 53 Stan. L. Rev. 1201 (2001)).

**IV.**

Lastly, I take issue with the majority's reference to the ATSDR's investigation dealing with the Navy's contamination of the environment in Vieques. <u>See</u> Maj. Op. at 39 n.12. At this procedural stage this investigation is irrelevant to the present case. <u>See</u> <u>Ocasio-Hernández</u>, 640 F.3d at 13-14 (the merits of the issues underlying a complaint are irrelevant at the motion to dismiss stage); <u>Hosp. Bella Vista</u>, 254 F.3d at 363 (court must accept as true all well-pleaded factual allegations without prejudging their weight or plausibility). Furthermore, although I agree with the majority calling the attention of Congress to the plight of the citizens of Vieques, an action which I join and applaud, this referral cannot be considered as an appropriate alternative or substitute to the exercise by these citizens of their right to present their legitimate claims, and to have them resolved, by a Court of the United States.

**V.**

In this latest chapter to the ongoing Culebra/Vieques saga, this Court blocks Plaintiffs' access to the courts of the United States, depriving U.S. citizens who live in Vieques of the only effective remaining forum in which to seek redress for their alleged wrongs. Access to the political forum available to most

-77-

other citizens of the United States has already been blocked by this same Court.  See Igartúa v. United States, 654 F.3d 99, 101-02 (1st Cir. 2011) (Torruella, J., concerning the denial of en banc consideration); see also Balzac v. Porto Rico, 258 U.S. 298, 308-09 (1922) (describing the limited "civil, social, and political" rights that attach to United States citizens residing in Puerto Rico).  I for one, protest this intolerable and undemocratic situation in the strongest of terms.

I dissent.